## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WEIRTON HEALTH PARTNERS, LLC.     C.A. No.:  5:09-CV-40

        Plaintiff,     Electronic Filing

    v.

GABRIELLE YATES,

        Defendant.

## MEMORANDUM IN SUPPORT OF WEIRTON HEALTH PARTNERS' MOTION FOR SUMMARY JUDGMENT

AND NOW comes counterclaim defendant, Weirton Health Partners, LLC ("WHP"), by and through its attorneys, Avrum Levicoff, Esquire, Denise Abbott, Esquire and Levicoff, Silko & Deemer, P.C. and files the following Memorandum in Support of Weirton Health Partners' Motion for Summary Judgment on Gabrielle Yates' Counterclaim, as follows:

### INTRODUCTION

The material facts of this case are largely undisputed.  On November 1, 2008, Wyngate Senior Living Community Resident Assistant Gabrielle Yates placed a phone call to the daughter of an elderly female resident and reported that her mother was performing oral sex on a male resident.  She further reported that Wyngate was aware of the conduct and was instructing employees to "close the door and walk away."  In fact, no such conduct ever occurred and no such instruction was ever given.  Utterly distraught, the daughter, who was in Arizona for a family wedding that weekend, contacted the police and had her mother removed from the facility the following day.  As a result of her conversation with Yates, the daughter refused to speak with Wyngate management prior to removing her mother from Wyngate.

Yates was not acquainted with the female resident's daughter and had no relationship with either elderly resident other than routine care giving.  Yates did not witness the event she alleges occurred and never spoke to any of the witnesses to the interaction leading to the false rumors of oral sex and exploitation.  Yates, who was on the cusp of termination for absenteeism, simply took it upon herself to call the family of a resident and repeat false and inflammatory rumors that she never bothered to authenticate or confirm with any of the actual observers.  Furthermore, in contravention of West Virginia law and Wyngate policy, Yates failed to report her concerns about the allegations of oral sex to Wyngate, its corporate hotline or any of the several state agencies charged with receiving and responding complaints of resident abuse.

Weirton Health Partners terminated Yates' employment immediately after learning of her conduct for failing to utilize the chain of command and for reporting false rumors and unsubstantiated statements to a resident family member.  Yates alleges that her statements to the family are protected activity in furtherance of the public policies of West Virginia and that her termination was thus unlawful.

## FACTS

On or about July 20, 2005, Gabrielle Yates ("Yates") began at-will employment with Weirton Health Partners as a Resident Assistant at the Wyngate Senior Living Community ("Wyngate").  (Countercl. ¶ 2).  Yates had no training or prior experience in working with the elderly or in any type of care facility.  (Yates 17, 43).[1]  Wyngate employees are provided with a Community Guidebook which sets out general guidelines and expectations for employee performance.  (**Ex. B**)  The guidebook clearly states that "[T]he policies in the guidebook are guidelines only, with the exception of the policy on at-will employment, and they should assist you in attaining a beneficial employment relationship with us."  (**Ex. C**).  Although the

---

[1]   A copy of the relevant pages of the deposition transcript of Gabrielle Yates are attached hereto as **Exhibit A.**

Guidebook contains a discipline procedure, that section also instructs that "it should be understood that this disciplinary procedure is intended as a guideline. As a result, we may determine that the nature of the offense, the employee's performance record, or a major act of misconduct may warrant immediate suspension or termination." (**Ex. D**)

During her employment, Yates was also provided with a copy of her job description. (**Ex. E**). As part of her essential job responsibilities, Yates was to "report all concerns about residents to supervisors and co-workers." (Yates 41, **Ex. E**). In 2008, Yates began to demonstrate a pattern of significant attendance issues. On May 7, 2008, Yates arrived at work, but shortly thereafter left the facility without informing any staff member. (**Ex. F**). After management was unable to reach her by telephone, they called the sheriff's department over concern that she might have been in an accident. (**Ex. F**). At 2:00 p.m. the following day, Yates called Wyngate to apologize for her actions and requested that she keep her job. (**Ex. F**). Yates was placed on a 30-day probationary period. (**Ex. F**).

On July 17, 2008, Yates was issued a written notice advising her that she had accumulated four absences since March 1, 2008 and reiterating Wyngate policy regarding absenteeism. (**Ex. G**). On August 19, 2008, Yates received a performance review rating her performance as commendable, but dependability and attendance as "unacceptable," specifically noting that she needed to work on her absenteeism. (**Ex. H**).

In the summer of 2008, two octogenarian residents at the facility began spending time together, walking, holding hands, eating meals together and occasionally kissing. In late July of 2008, Wellness Director Tammy Provenzano contacted the daughter of the female resident to report the growing relationship. (Provenzano 77).[2] Provenzano reported to the family member

---

[2] Copies of the relevant pages of former Wellness Director Tammy Provenzano's deposition, identified as are attached hereto as **Exhibit U**.

that the female resident was found fully dressed on the male resident's bed and that he had his arms around her and was kissing her. (Provenzano 77). The family member responded that she had done a lot of research on Alzheimer's and that she was "totally okay with this." (Provenzano 77-78). The family member went on to state that she was happy that [the female resident] had found someone that she could love while she lived at the facility and she hoped that her mother would be happy. (Provenzano 77-78). The family member requested that if the female resident was found in the male resident's room, staff was to redirect her without upsetting her. (Provenzano 80).

On October 29, 2008, LPN Cecelia McClory reported to WHP management that the couple was found engaged in some degree of intimacy in the male resident's room. (Petras 90-92).[3] Although the accounts of the two alleged first-hand observers were inconsistent, it was clear that some report had been made with respect to the couple. (Boyce 98).[4] Resident Aide Michelle Shonkweiler, one of the witnesses, allegedly observed the male resident laying on his back and the female resident sitting next to him, but did not observe "oral sex or nothing of that nature." (Shonkweiler 37).[5] McClory allegedly observed the residents lying on their backs and the female resident's hand on the male resident's private area for "a second." (McClory 144).[6] Yates was not present when the incident allegedly occurred and neither Shonkweiler nor McClory ever discussed the incident with Yates. (Shonkweiler 64, McClory 129-130).

On October 31, 2008, Yates received a verbal counseling regarding her excessive number of call-offs and was instructed that she was to work all scheduled shifts for 30 days and her

---

[3] Copies of the relevant pages of Residence Manager Deb Petras' deposition, identified as are attached hereto as **Exhibit I.**
[4] Copies of the relevant pages of Director of Operations Kim Boyce's deposition, identified as are attached hereto as **Exhibit J.**
[5] Copies of the relevant pages of Resident Aide Michelle Shonkweiler's deposition, identified as are attached hereto as **Exhibit K.**
[6] Copies of the relevant pages of LPN Cecelia McClory's deposition, identified as are attached hereto as **Exhibit L.**

employment would then be reevaluated. (**Ex. M**). At that time, Yates' job was in jeopardy due to her absenteeism and management was considering terminating her. (Bowden 166, Petras 188-189).[7]

The following day, on November 1, 2008, Yates called Ellen Hughes, daughter of the female resident after locating her cell phone number in the residents' chart. (Yates 131-133). Hughes, a regular visitor to the facility, was in Arizona for a family wedding at the time. (Hughes 6).[8] Hughes was not acquainted with Yates could not recall if she had ever met Yates before. (Hughes 8). Yates told Hughes that her mother was discovered performing oral sex on a male resident. (Yates 132, Hughes 12). Yates further stated that the incident was reported to Debra Petras, Residence Manager, and that Petras told employees to "shut the door and walk away and come back later see if she was okay – see if they were done and then take them to separate rooms." (Yates 132). Yates testified that she told Hughes that she personally witnessed the incident on October 29, 2008. (Yates 132-133).[9]

In fact, Yates never witnessed such an incident and no such incident ever occurred. No witness has ever reported that the female resident was performing oral sex on the male resident, including the two first-hand observers. No one, including Debra Petras, has ever testified that they were personally told by any Wyngate management employee to shut the door and walk away if they observed sexual conduct between the residents. In fact, no incidents of sexual contact between the residents were ever reported to Petras prior to October 29, 2008. Moreover,

---

[7] Copies of the relevant pages of Wellness Director Jody Bowden's deposition, identified as are attached hereto as **Exhibit N.**
[8] Copies of the relevant pages of Ellen Hughes, daughter of the female resident's deposition, identified as are attached hereto as **Exhibit O.**
[9] Yates also later testified to the contrary - that she *did* inform the daughter that she did not witness the incident.

Yates never spoke to either of the two alleged first-hand observers about the incident. (Shonkweiler 64, McClory 129-130, Yates Nov. 14, 2007 Statement 13).[10]

Yates was familiar with the Wyngate policy contained in the Community Guidebook that states "employees are required by law to immediately report to management any form of abuse that is observed, giving the name of the resident, the employee involved, the time, date, place and description of what occurred" (Yates 108, **Ex. Q**). Yates acknowledged that she was expected to read the state agency and corporate hotline telephone numbers and information posted in the break room regarding reporting of abuse of neglect, but "she never really read anything." (Yates 118-119). Yates also testified that "her position as an aide was to report to a nurse and the position of the nurse had to report to the head nurse and the head nurse would report to Debbie, the boss position." (Yates 111). Yates was clearly aware a chain of command was to be followed when an employee had concerns about possible resident abuse. (Yates 111).

Yates alleged in her Counterclaim that upon learning of the sexual relationship between the residents that occurred on October 29, 2008, she notified her supervisors at Wyngate prior to calling Ellen Hughes. (Countercl. ¶6-8). However, Yates later testified that she never reported her concerns about the incident to any management employee at Wyngate, including Petras or Bowden, before she called Ellen Hughes. (Yates 141). At the time she made the telephone call, Yates was unaware whether any investigation had been done with respect to the October 29, 2010 incident or if the incident had been reported to any agency. (Yates 125, 141).

Despite the fact that Yates was aware she was obligated by law to report suspected resident abuse, Yates did not call adult protective services, the corporate hotline, the office of

---

[10] Copies of the relevant pages of Yates' December 8, 2008 statement to attorney Christopher Wallace are attached hereto as **Exhibit P**. Although Yates testified in her December 8, 2009 deposition that she learned of the incident directly from Michelle Shonkweiler, Yates denied ever speaking to Shonkweiler in a sworn statement provided to the attorney for the female resident, taken two weeks after the alleged incident occurred. Moreover, both Shonkweiler and McClory deny ever speaking to Yates.

licensure and certification or any other agency charged with handling reports of suspected resident abuse, prior to calling Ellen Hughes. (Yates 117, 151). Yates was terminated on November 1, 2008 for failing to follow the chain of command and directly contacting the family member of the female resident to report false statements and rumors. (Yates 153, **Ex. R**).

After her termination, Yates immediately increased work at her existing part-time job at Domino's Pizza in Weirton, West Virginia. (Yates 21-22). As a result, Yates experienced almost no loss of income resulting from her termination, until she was fired from Domino's for money theft. (See Aff. of Morgan Lacefield).[11] In her deposition, Yates testified, however, that she left Domino's because "they did not have enough hours to let me work there no longer." (Yates 22).

## PROCEDURAL BACKGROUN

As a result of Yates' unsubstantiated and false statements that the female resident was performing oral sex on a male resident, that Wyngate was aware of it and that Wyngate instructed employees to disregard such conduct, WHP filed a Complaint against Yates on April 14, 2009, asserting defamation and several other related causes of action. Yates filed an Answer to Complaint and Counterclaim on July 10, 2009, alleging wrongful termination in violation of West Virginia public policy and the tort of outrage. WHP moved to dismiss Yates' Counterclaim and strike Yates' request for attorneys' fees on July 30, 2009. On December 28, 2009, Yates filed a motion to amend her Counterclaim to add claims for abuse of process and violation of W.Va. Code §5-11-9(7), the West Virginia Human Rights Act. In an Order dated March 4, 2010, this Court granted Yates' Motion to Amend her Counterclaim as well as WHP's Motion to Strike and Motion to Dismiss Yates' claim for outrage, with leave to amend. The Order directed Yates to file and serve her Amended Counterclaim, including her additional

---

[11] The affidavit of Morgan Lacefield is attached hereto as **Exhibit S**.

causes of action, along with any amendment she desired to make on her tort of outrage claim on or before March 19, 2010. Yates failed to file an Amended Counterclaim, abandoning her claims for abuse of process and violation of W.Va. Code §5-11-9(7). Consequently, WHP will not address those claims in this Motion for Summary Judgment. WHP filed an Answer to Yates' remaining Counterclaim for wrongful termination in violation of public policy on March 23, 2010.

## STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Goodson v. Hickey, (S.D.W.Va. 2010). Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Goodson v. Hickey, (S.D.W.Va. 2010), citing, Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, all inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Goodson v. Hickey, (S.D.W.Va. 2010), citing, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences

which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.  Goodson v. Hickey, (S.D.W.Va.2010).

## ARGUMENT

**I.**     **WHP did not contravene the substantial public policies of West Virginia when it terminated her for calling a resident family member to repeat false rumors and unsubstantiated statements.**

Yates alleges that her termination was in violation of the substantial public policy of West Virginia.  (Countercl. ¶10).  In order to succeed on a claim for wrongful termination in violation of public policy claim, Yates must (a) identify a substantial public policy and (b) establish that her discharge was motivated by WHP's desire to contravene that substantial public policy.  Bowe v. Charles Area Medical Center, 189 W.Va. 145, 149 (1993).  WHP can defeat Yates' wrongful termination claim by demonstrating that Yates would have been terminated absent any protected conduct.  Id.

According to this Court's March 10, 2010 Order, the substantial public policies implicated by Yates' Counterclaim include W.Va. Code §§16-5D-1(a)(b), .16-5D-8(c), 61-8B-4 and 61-8B-8(a).

### A.     Assisted Living Facilities Act – W.Va. Code §16-5D-1(a)(b), §16-5D-8(c)

Yates was terminated because she made a telephone call to the family member of a female resident and reported false and unsubstantiated rumors that the resident was performing oral sex on another resident and that WHP was aware of this conduct and instructed employees to shut the door and walk away.  In essence, Yates argues that this conduct is protected activity in furtherance of the West Virginia public policy designed to protect assisted living residents from abuse and that termination for this conduct is therefore unlawful.

Clearly, reporting observations of suspected abuse is mandated by both West Virginia law and Wyngate Senior Living Community. However, reporting false and incredibly inflammatory rumors directly to a family member where Yates had no first or even second-hand knowledge of the false information she reported was not only improper, it caused extreme distress to the family member and damage to Wyngate. Simply put, an employee does not have carte blanche to repeat any salacious rumor she hears and expect to be protected from termination on the basis that the rumor may conceivably touch on allegations of resident abuse. Moreover, the purpose of Wyngate's instruction to Resident Aides that they are to report suspicions of resident abuse to management is to put Wyngate on immediate notice of any allegations of resident abuse and prevent the very type of false statements that Yates made to the family of the female resident.

What makes Yates' conduct particularly egregious is the fact that Yates knew that her reports were based solely on unsubstantiated rumor yet, she failed to take any action whatsoever to confirm the truth of her statements. Had she done so, she would have known that no first-hand witness has ever reported that the female resident performed oral sex on another resident Moreover, there is no record evidence of any kind that any Wyngate management employee was aware of allegations of oral sex and certainly no evidence that an employee was told by a Wyngate management employee to ignore such conduct.

Gabrielle Yates had a multitude of appropriate options that she could have exercised to report concerns of perceived abuse before resorting to the repetition of false and inflammatory rumors to the family of the female resident. Yates could have, in accordance with the requirements of her job duties and Wyngate policy, reported her suspicions about the incident to Residence Manager Deb Petras, Wellness Director Jody Bowden, the corporate hotline, the West

Virginia Office of Licensure and Certification ("OHFLC"), the Long-Term Care Ombudsman's Office, Adult Protective Services or the police. Yates did none of these things. (Yates 151).

Yates never bothered to ask anyone what action Wyngate was taking with respect to the alleged incident before she called the family member to report a false rumor that a female resident was performing oral sex on another resident and that Wyngate was condoning such conduct. (Yates 125). She didn't ask Deb Petras about it, she didn't ask Jody Bowden about it and she didn't ask the first-hand observers about it. (Yates 140-141). She didn't know if any investigation was underway regarding the alleged incident, because she never asked anyone. (Yates 141). Although Yates alleges that she knew a number of other aides had reported the incident up the "chain of command," to Petras, Yates could not identify a single aide who had actually done so. (Yates 126, 128-129, 148).

Instead, Yates, on the cusp of termination for attendance issues, chose to call the family member to repeat incredibly inflammatory and provocative third-hand rumors of oral sex and resident exploitation in direct violation of the rules and regulations of Wyngate. In the process, Yates caused extreme distress to the family of the female resident and defamed Wyngate.

WHP does not terminate employees for making good-faith complaints about resident concerns. To the contrary, WHP demands that employees inform Wyngate immediately when they suspect resident abuse. WHP's motivation in firing Yates was to terminate the employment relationship with an employee who repeated false rumors and made unsubstantiated damaging statements directly to the family of a resident without exercising any other required or appropriate option for reporting her concerns.

1.      **Yates has not engaged in protected activity under the West Virginia Assisted Living Residences section of the West Virginia Code.**

As a threshold matter, Yates' conduct in making a telephone call to the family of a female resident and repeating false rumor is not the type of conduct protected by the public policy emanating from W.Va. Code §§ 16-5D-1(a)(b) or 16-5D-8(c).[12]   Ironically, the West Virginia Assisted Living Residences section under which Yates sues, provides and protects the *appropriate* mechanism for reporting concerns of resident abuse.

These sections, as cited specifically in 16-5d-8(c), provide protection from discrimination to employees who engage in very specific conduct: (1) employees who make certain protected complaints to the secretary of the State Department of Health and Human Resources ("WVDHHR") or his/her designee, and/or (2) participate in a proceeding under Article 5D. W.Va. Code §§ 16-5D-8(c) does not provide a "catch-all" cause of action to an employee who makes any type of complaint to any entity.   Certainly, Yates has not and cannot proffer any evidence that she engaged in protected conduct under §16-5D-8(c) and the Assisted Living Facilities section does not contemplate false reports of oral sex and exploitation made directly to a family member.   Yates now sues under a statute which she should have utilized before reporting unsubstantiated rumors and false statements directly to the daughter of the resident.

---

[12] W.Va. Code §16-5D-8(c) states: " No assisted living residence may discharge or in any manner discriminate against any resident or employee for the reason that the resident or employee **has filed a complaint or participated in any proceeding specified in this article**. Violation of this prohibition by any assisted living residence constitutes ground for the suspension or revocation of the license of the assisted living residence as provided in section eleven of this article. Any type of discriminatory treatment of a resident or employee by whom, or upon whose behalf, a complaint has been submitted to the secretary , or any proceeding instituted under this article, within one hundred twenty days of the filing of the complaint or the institution of the action, shall raise a rebuttable presumption that the action was taken by the assisted living residence in retaliation for the complaint or action."

**2.** **Directly contacting a family member to repeat false and unsubstantiated rumors of sexual abuse and exploitation is not protected activity under any legal theory of retaliatory discharge.**

An employee does not have the absolute right to engage in any type of conduct in violation of work rules or common sense, even if the conduct may implicate protected activities. See N.L.R.B. v. Truck Drivers, et al., 630 F.2d 505, 508 (7th Cir. 1980)(that employees are protected while presenting wage complaints does not give them carte blanche in choosing the method of presentation, or in their choice of time and place for making those complaints). The making of false and potentially damaging statements about an employer is a legitimate, non-retaliatory basis for terminating an employee. Simon v. Simmons Foods, Inc., 49 F.3d 386, 388 (8th Cir. 1995). In Simon, an employee at a chicken processing plant was appropriately terminated after he falsely informed a company contractor that the company fed contaminated feed to its chickens, sold the contaminated chickens and buried a substantial quantity of the tainted feed on its property. Id. Plaintiff based his report, in part, on his personal "observations" of the chickens. Although the employee may have been engaged in protected activity at the time he made false statements about the company, the employee would have been terminated for the making of the false statements, absent any protected activity. Id.

In other similar cases of employee misconduct during alleged protected activity, courts have been more than willing to identify parameters of protection based on the manner in which an employee attempts to engage in "whistleblowing." The U.S. District Court for the Eastern District of Virginia held that the unauthorized distribution of employer documents in an effort to assist in a co-worker's discrimination claim is not protected activity and constitutes a breach of an employee's duty of honesty and loyalty absent a specific showing that no alternative to the

dishonest and disloyal conduct existed.  Laughlin v. Metropolitan Washington Airports Auth., 952 F. Supp. 1129 (E.D. Va. 1997).

Similarly, in Redden v. South Carolina Dept. of Mental Health, Civ. A. No. 2007 4:05-3405, WL 2823016, 12 -13  (D.S.C. Sept., 27, 2007), the court analyzed protected activity under Title VII.  In that case, the court found that the employer articulated a legitimate reason for transferring an employee who continued to act improperly after making a complaint when the employee repeatedly discussed alleged 'sexual harassment' by a co-worker against another.  This conduct led to the entire workplace being filled with unsupported rumors and speculation.

While an employee may not suffer retaliation for protected activity ... the employee's own conduct must not be disruptive of the employer's business, as the anti-retaliation law " 'was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.' Id. (citing Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir.1981)).

Making appropriate good-faith complaints regarding resident abuse is protected activity. Calling a family member to report rumors information that employee knew or should have known were false is not.  Yates has not engaged in protected activity and her termination for her conduct was legitimate and non-retaliatory by law.

3.   **Assuming *arguendo*, that Yates' false report outside the chain of command constitutes protected activity, Yates could not have a reasonable belief that the incident she reported actually occurred.**

The Fourth Circuit has held that opposition activity is only protected when it responds to a practice that the employee reasonably believes is unlawful.  Jordan v. Alternative Resources Corp., 458 F.3d 332, 338-39 (4th Cir. 2006).  Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue may be

resolved as a matter of law.  Isaac v. CNX Company, LLC, No. 1:07-00722, 2008 WL 4186855 (Sept. 9, 2008, S.D.W.Va.).

In this case, Yates took no action whatsoever to confirm that any of the information she reported to Ellen Hughes was accurate before she repeated incredibly upsetting and ultimately false rumors to her.  Yates certainly didn't witness the event and Yates was never personally informed by any Wyngate management employee that she should ignore sexual activity between residents.  She didn't ask anyone at Wyngate management about the incident and she didn't speak with anyone who actually did witness the incident.  Yates' call to Ellen Hughes, whom she barely knew, could not have been based on a reasonable belief when Yates knew that what she was reporting was not her own information, but simply rumors about oral sex and comments about instructions to ignore the situation that she never heard herself.

In an after-the-fact attempt to interject herself into the October 29, 2009 incident and the relationship between the residents, Yates alleges in her Counterclaim that early in the fall of 2008, she discussed the fact that she didn't want the female resident in the male resident's room with Wellness Director Jody Bowden and LPN Candace Smith.  (Yates 72).  Smith denies that this conversation ever took place and Bowden has no recollection of any such conversation. (Bowden 106, Smith 188).[13]

On November 14, 2008, two weeks after Yates was terminated for reporting false rumors, the attorney representing the female resident's family, Christopher Wallace, took a sworn statement from Yates in anticipation of a potential lawsuit against WHP on behalf of the female resident.  Yates never mentioned the alleged conversation she had with Bowden and Smith, despite Wallace's extensive questioning on this subject.  During the interview, attorney Wallace asked Yates if she ever spoke with either Michelle Shonkweiler or Cecelia McClory regarding

---

[13] Copies of the relevant pages of LPN Candace Smith's deposition, identified as are attached hereto as **Exhibit T.**

the October 29, 2010 incident.  (Yates 11/14/08 Statement 13).  Yates responded, "no."  (Id.)
Yates explained that she learned about it on the Saturday she was terminated from two other non-
supervisory or management employees while the three of them discussed it in a resident's room.
(Id. at 15-16).  Yates also testified that she had "no doubt" that Shonkweiler and McClory
reported it up the chain of command.  (Id. 17).  When asked how she knew that they did, she
responded, because "they are very nice people."  (Id. 7).

Michelle Shonkweiler and Cecelia McClory both testified that they never spoke to Yates
about the October 29, 2008 incident.  (Shonkweiler, McClory).  Despite this, during her
deposition in the instant litigation on December 8, 2009, Yates testified that Michelle
Shonkweiler *did* tell her about the incident, in direct contradiction to her November 14, 2008
sworn statement.  (Yates 91).  However, at that 2009 deposition, Yates could not recall what
Michelle told her, when she told her, or why she told attorney Wallace she never spoke to
Shonkweiler when he asked her directly if she had.  (Yates 91-94).  On page 94 of her deposition
transcript, Yates testifies that she can't recall Shonkweiler telling her that the female resident
performed oral sex.  Two lines later, when asked a similar question, Yates alleges that
Shonkweiler "mentioned that she saw oral sex, but then we stated talking about Debbie."  (Yates
94).  In fact, Shonkweiler testified that she never spoke to Yates or made any reports that the
female resident was performing oral sex on the male resident.  (Shonkweiler 64).

Yates, who was on the cusp of termination for attendance issues, had no good-faith basis
to believe that the female resident was performing oral sex on the male resident or report such to
the family of the resident when she never witnessed it herself and never spoke to the first-hand
observers.  Yates' inconsistent testimony on the subject is further indication that Yates was
aware that she was repeating nothing more than rumors an innuendo.

**B.     Sexual Offenses - W.Va. Code §61-8B-4, §61-8B-8(a)**

Yates also alleges that her termination for making false statements to the female resident's daughter was also in contravention of the public policy emanating from two criminal statutes, W.Va. Code §61-8B-4 and §61-8B(a).[14]  For the reasons discussed above, Yates' call to the female resident to report unsubstantiated rumors of oral sex and resident exploitation is not protected activity under any public policy in accordance with Harless v. First National Bank in Fairmont, 162 W.Va. 116, 124 (1978).  The making of false statements to a family member, is however, a legitimate non-retaliatory basis for terminating Yates' employment.

Moreover, to the extent that Yates argues her call to the female resident's family was in response to what she believed to be criminal conduct, Yates had no good-faith basis to believe that criminal conduct was occurring on October 29, 2008 based on her lack of first or even second-hand knowledge and if she did, the appropriate response would be to contact law enforcement, Residence Manager Deb Petras, Wellness Director Jody Bowden, the corporate hotline, the West Virginia Office of Licensure and Certification, the Long-Term Care Ombudsman's Office or Adult Protective Services.  Yates did none of these things.  (Yates 151).

Yates was not a witness to the incident, was not working when it occurred, did not speak to any of the first-hand observers, did not ask any management employee about what had happened or express any of her concerns to them about the rumors surrounding October 29, 2008.  Yates had no knowledge whether any other employee had reported the October 29, 2008 incident to management or whether management was investigating the incident.  She didn't

---

[14] **§61-8B-4. Sexual assault in the second degree:** (a) A person is guilty of sexual assault in the second degree when: (1) Such person engages in sexual intercourse or sexual intrusion with another person without the person's consent, and the lack of consent results from forcible compulsion; or (2) Such person engages in sexual intercourse or sexual intrusion with another person who is physically helpless.  **§61-8B-8. Sexual abuse in the second degree:** (a) A person is guilty of sexual abuse in the second degree when such person subjects another person to sexual contact who is mentally defective or mentally incapacitated.

bother to inquire and instead called a family member to report unfounded, salacious and inflammatory rumors.

**C.    Truthful Testimony – <u>Page v. Columbia Natural Resources</u>**

Yates alleges, apparently in the alternative, that WHP terminated her employment in order to prevent her from providing truthful testimony in a lawsuit by the female resident. (Countercl. ¶10). In support of this claim, Yates alleges that it is "very likely that Plaintiff knew that it was at substantial risk of becoming involved in litigation with the abused female resident." (Yates' Opp. to WHP's Motion to Dismiss, pg. 5). Yates then offers in a footnote that an action against WHP by the female resident is "currently pending." (Id.) In fact, no such lawsuit was pending on August 12, 2009, the date Yates filed her opposition, and no lawsuit has been filed to date.

Nonetheless, in a <u>Harless</u> action, the counterclaim plaintiff has the burden to prove that her discharge occurred *because* of the violation of substantial public policy. <u>Page v. Columbia Natural Resources</u>, 198 W.Va. 378, 387, 480 S.E.3d 817, 826 (W.Va. 1996). Yates has offered no evidence whatsoever to satisfy her initial burden. No testimony has been taken or offered that could possibly link her termination to an alleged motivation on the part of WHP to prevent her from testifying in a hypothetical lawsuit. To be sure, no evidence has been proffered that would suggest in any manner that WHP feared a lawsuit from the family of the female resident prior to or on the day it terminated Yates. To the contrary, it seemed obvious to WHP that any damage that occurred on the day of Yates' termination was related to her false and defamatory statements regarding WHP. For the foregoing reasons, Yates' call to the family is not protected activity and is instead a legitimate non-retaliatory reason for terminating her employment.

Mere conclusory allegations of motivation do not preclude summary judgment. Yarnevic v. Brink's Inc., 102 F.3d 753 (4th Cir. 1996)(rejecting plaintiff's argument that "all the facts" establish that the employer had a motive for destroying his career and thereby terminated him in order to send a message to others who might be inclined to act as he did). In this case, Yates offers nothing more than bald conclusions with respect to her claim that she was terminated in order to prevent her from providing testimony on behalf of the female resident in a hypothetical lawsuit. This is simply not enough to sustain her cause of action.

In Page, the West Virginia Supreme Court of Appeals instructed that "a reasonable employer should be aware that any attempt to interfere with the process of obtaining truthful testimony, by either intimidating a potential witness/employee prior to his or her testimony or retaliating against such witnesses/employee thereafter, violates the clear and substantial policy of this State. Page v. Columbia Natural Resources, at 387 (emphasis added).

In this case, no retaliation against Yates could have occurred for providing truthful testimony, as was the case in Page, since no litigation or proceeding had occurred and certainly Yates had not participated in any such litigation or proceeding at the time of her termination. Thus, the only application the substantial public policy emanating from Page has in the instant matter is the notion that WHP terminated Yates' employment in order to "intimidate" her as a potential witness. This theory is nonsensical. It seems obvious that terminating an employee for allegedly improper reasons would be *more likely* to make them a potentially adverse witness. Yates fails to assert or even explain how WHP intimidated her from giving testimony by firing her. In fact, the only action resulting from WHP's termination of Yates to date is a counterclaim against WHP. Yates' failure to offer any facts whatsoever to support this vague theory requires that her claim be dismissed.

## CONCLUSION

In conclusion, Yates has not engaged in conduct protected by any public policy in the State of West Virginia.  Repetition of false rumors and unsubstantiated statements to family members does not assist in protecting the welfare of the residents of assisted living facilities.  In fact, such conduct undermines the ability of the facility to promptly respond to allegations of resident abuse.  Yates failed to inform any management employee at Wyngate of her concern that a female resident was performing oral sex on a male resident and never bothered to confirm the false rumor that employees should "shut the door and walk away" if they saw such conduct.  Nor did Yates report her concerns, as both West Virginia law and Wyngate policy require, to any state agency or authority in the alternative.

Because Yates cannot establish that her false statements to a family member were protected activity in furtherance of the public policy of West Virginia, she cannot establish that her termination was motivated by WHP's desire to contravene any public policy.  To the contrary, Yates' repetition of false rumor and unsubstantiated statements is a legitimate non-retaliatory basis for her termination.  Accordingly, Yates' counterclaims should be dismissed in their entirety and judgment entered on behalf of Weirton Health Partners.

By:   /s/ Denise R. Abbott
      Avrum Levicoff, Esquire
      W.Va. I.D. #: 4549
      Denise R. Abbott, Esquire
      W.Va. I.D. #: 10114
      Levicoff, Silko & Deemer, P.C.
      Centre City Tower, Suite 1900
      650 Smithfield Street
      Pittsburgh, PA  15222-3911
      412-434-5200

      ***Counsel for Counterclaim Defendant***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WEIRTON HEALTH PARTNERS, LLC.            C.A. No.: 5:09-CV-40

        Plaintiff,                          The Honorable Frederick P. Stamp, Jr.

   v.

GABRIELLE YATES,

        Defendant.

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on April 27, 2010, I electronically filed the foregoing Memorandum In Support Of Weirton Health Partners' Motion For Summary Judgment with the Clerk Of Court using the CM/ECF System which will send notification of such filing to the following CM/ECF participants:

Michael Simon, Esquire                          Steven Recht, Esquire
Frankovitch, Anetakis, Colantonio & Simon       Recht Law Office
337 Penco Road                                  P.O. Box 841
Weirton, WV 26062                               Weirton, WV  26062

                       By:   /s/ Denise R. Abbott
                              Avrum Levicoff, Esquire
                              W.Va. I.D. #:  4549
                              Denise R. Abbott, Esquire
                              W.Va. I.D. #:  10114
                              Levicoff, Silko & Deemer, P.C.
                              Centre City Tower, Suite 1900
                              650 Smithfield Street
                              Pittsburgh, PA  15222-3911
                              412-434-5200

                              *Counsel for Counterclaim Defendant*

{L0276533.1 }