IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

- - -

| | |
|---|---|
| WEIRTON HEALTH PARTNERS, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Civil Action ) No. 5:09-CV-40 |
| GABRIELLE YATES, | ) ) |
| Defendant. | ) |

**CONDENSED TRANSCRIPT**

Deposition of GABRIELLE J. YATES

Tuesday, December 8, 2009

- - -

The deposition of GABRIELLE J. YATES, Defendant herein, called for examination by the Plaintiff, taken pursuant to Notice and the Federal Rules of Civil Procedure pertaining to the taking of depositions, taken before me, the undersigned, Jamie J. Belfiore, Certified Court Reporter-Notary Public in and for the State of West Virginia, held in the law offices of Frankovitch, Anetakis, Colantonio & Simon, 337 Penco Road, Weirton, West Virginia 26062, commencing at 9:15 o'clock a.m., on the day and date above set forth.

JAMIE J. BELFIORE
CERTIFIED COURT REPORTER
PA 724.746.9844
800.914.DEPO (3376)

EXHIBIT A

17

1 A. It had to have been at least, I think, about
2 four or five months, because I started in Wyngate in
3 July. I left there, I know it was after the new year.
4 Q. Did you leave Ashland to find different
5 employment?
6 A. Yes.
7 Q. Okay.
8 Now, just to confirm, before you came to
9 Weirton Health Partners, you didn't have any prior
10 experience in an assisted care facility --
11 A. No.
12 Q. -- or a nursing home?
13 A. No.
14 Q. No experience working with the elderly or
15 patients with Alzheimer's or dementia, anything like
16 that?
17 A. No.
18 Q. You said you started working at Wyngate in July
19 of 2005?
20 A. Yes.
21 Q. I have July 20th as your start date.
22 Is that correct?
23 A. Yes.
24 Q. Does that sound right to you?

18

1 A. Yes.
2 Q. What was your position at that time?
3 A. An aide.
4 Q. A resident aide?
5 A. Yes.
6 Q. Do you know what kind of background
7 educationally was necessary to have the resident aide
8 position?
9 A. No.
10 Q. You worked there through November of 2008; is
11 that correct?
12 A. Yes.
13 Q. In 2008 what was your schedule?
14 A. It was daylight.
15 Q. What does that mean?
16 A. 5:00 a.m. to 1:30 p.m.
17 Q. How many days a week did you work?
18 A. I worked five days a week, full time.
19 Q. How many hours would that be?
20 A. 40 hours.
21 Q. 40 hours, okay.
22 Did you work any overtime?
23 A. Yes.
24 Q. How often did you work overtime?

19

1 A. Whenever they needed it.
2 Q. What would you estimate that to be? Every
3 week?
4 A. No.
5 At least once a month I worked overtime.
6 Q. How many hours during that week would you say
7 you worked overtime?
8 A. At least, maybe, six hours, eight hours
9 sometimes. If they needed me to come in, I would come
10 in.
11 Q. Did you request overtime or did they ask you to
12 come in?
13 A. No.
14 They called me. If someone reported off, they
15 would call me and I would come in.
16 Q. Now, we're going to talk about after you left,
17 we're going to look at your work history here after
18 you left Weirton Health Partners.
19 Did you apply for unemployment compensation
20 benefits?
21 A. Yes.
22 Q. Were those benefits approved or denied?
23 A. Denied.
24 Q. Did they tell you why your benefits were

20

1 denied?
2 A. No.
3 Q. You said that you are currently employed?
4 A. Yes.
5 Q. Can you tell me about who you are working for
6 right now?
7 A. Cambridge Home Health.
8 Q. Okay.
9 What do you for Cambridge Home Health?
10 A. I'm an aide, home health aide. I go to the
11 client's home and help them with their needs.
12 Q. How many hours a week do you work for them?
13 A. 25.
14 Q. You travel, you said?
15 A. Yes.
16 Q. From resident's home to resident's home?
17 A. Well, I have one home right now that I'm doing.
18 Q. You take care of one person?
19 A. Yes.
20 Q. What is your hourly rate of pay there?
21 A. $8.00.
22 Q. You said -- I'm sorry.
23 You work about 25 hours a week?
24 A. Yes.

21

1  Q. Tell me about the person that you care for.
2  What are their limitations, why do they need your
3  services?
4  A. She just needs me to come and help take care of
5  her house and take care of her.
6  Q. Okay.
7     Does she have physical restrictions?
8  A. I don't think I can speak with that because I
9  am her aide and my bosses say I can't talk to other
10 people about her restrictions.
11 Q. Okay. Okay.
12    You are providing home health services for her?
13 A. Yes.
14 Q. Now, following your separation from Weirton
15 Health Partners, were you unemployed for any period of
16 time?
17 A. I started working for Domino's, then I --
18 Q. Was that immediately after?
19 A. I started working for Domino's right before --
20 It was very part time, maybe one day a week, one or
21 two days a week, with my husband, trying to get a few
22 extra dollars for Christmas, then he put me up to at
23 least 30 hours a week after leaving Wyngate.
24 Q. You started to work for Domino's before you

22

1  left Wyngate?
2  A. Yes.
3  Q. When you left, then you increased your hours?
4  A. Yes.
5  Q. Which Domino's was this?
6  A. Weirton, West Virginia.
7  Q. You said that you worked with your husband
8  there?
9  A. Yes.
10 Q. What did he do there?
11 A. He's the general manager.
12 Q. What did you do at Domino's?
13 A. Cook.
14 Q. How much were you paid hourly?
15 A. It was $8.00.
16 Q. Okay.
17    When did you leave that position?
18 A. I'm trying to think.
19    April of '09.
20 Q. Why did you leave?
21 A. Because they did not have enough hours to let
    me work there no longer.
23 Q. What did you do after you left there?
24 A. I tried to find employment, but I could not

23

1  find employment.
2  Q. Okay.
3     You identified some places to which you applied
4  for jobs in your interrogatories, so I am going to get
5  a copy of those for your review and we'll go over
6  those.
7        MS. ABBOTT: Mark that, please.
8        (Whereupon, Deposition Exhibit No. 1 was
9  marked for identification.)
10 BY MS. ABBOTT:
11 Q. Do you recognize the document that I have put
12 in front of you?
13 A. Yes.
14 Q. Are these the responses that you provided to
15 the interrogatories that were served to you in this
16 matter?
17 A. Yes.
18 Q. Okay.
19    If you turn to the back here, there is a
20 verification page at the very back.
21    Is that your signature on the verification
22 page?
23 A. Yes.
24 Q. Okay.

24

1     Now, if you take a look at No. 8, the response
2  to Interrogatory No. 8, I would like to go through
3  each of these that you identified and you can tell me
4  a little about when you applied for this job and what
5  happened once you applied.
6     Let's start with Convenient Mart. When did you
7  apply for a job at Convenient Mart?
8  A. Maybe in June.
9  Q. June of 2009?
10 A. Yes.
11 Q. What position did you apply for?
12 A. Cashier.
13 Q. What happened when you applied for a job?
14 A. I turned in the application and I called back
15 at least two or three times. They said that they were
16 no longer hiring.
17 Q. How about Dollar General?
18 A. Dollar General, I went and got an application
19 and filled it out, came the next day, they did a
20 little interview, I filled out some papers and they
21 told me that right now they hired two people, that
22 they will keep me on file if they need me, which they
23 never called me back.
24 Q. Where is that Dollar General located?

41

1 the middle of the page?
2   A. Yes.
3   Q. 7/20/05, would that have been the date that you
4 started working at Weirton Health Partners?
5   A. Yes.
6   Q. Do you understand this document to say that you
7 have read and understand the responsibilities of your
8 position?
9   A. Yes.
10   Q. Is the next page an accurate description of
11 what your job duties were?
12       MR. RECHT: Why don't you read through the
13 whole thing, then she will ask you some questions?
14       (Brief pause.)
15   A. Yes.
16   Q. I am going to ask you about a couple of
17 specifics on this "POSITION DESCRIPTION."
18       Do you agree that it was part of your job duty
19 to "Report concerns about residents to supervisor and
20 coworkers"?
21   A. Yes.
22   Q. Was it also in your job description to
23 "Maintain confidentiality of verbal and written
24 information pertaining to residents, facility

42

1 operations and personnel"?
2   A. Yes.
3   Q. Tell me about what you believe your role to be
4 in evaluating interactions between the residents at
5 Wyngate?
6   A. Can you repeat the question?
7   Q. Sure.
8       Can you tell me what you think your role was in
9 evaluating interactions between residents? How was
10 that part of your job?
11   A. How was that part of my job?
12   Q. Yes.
13   A. Evaluating how they respond to each other?
14   Q. Yes.
15   A. Like if two residents were arguing with each
16 other, that I would try to calm them down and get the
17 nurse to come over and help so no one would get hurt
18 in that situation. That would be my situation if
19 something was going on between two residents.
20   Q. So it would be part of your job to report that
21 type of situation to your supervisor?
22   A. Yes.
23   Q. Do you have any special training or expertise
24 with the elderly that might have dementia or emotional

43

1 issues?
2   A. No.
3   Q. Do you have any expertise in the care of
4 Alzheimer's patients?
5   A. No.
6   Q. Do you have any special experience or training
7 in the relationships between Alzheimer's patients?
8   A. No.
9   Q. Do you have any special qualifications for
10 observing behaviors of Alzheimer's patients and then
11 interpreting what their best care situation might be?
12   A. No.
13   Q. Are you able to make any medical evaluations of
14 Alzheimer's patients?
15   A. No.
16   Q. What training do you have that enables you to
17 determine whether a resident is capable of making his,
18 or her, own decisions?
19   A. With working with them every day, I can see
20 what help they do need and what help they don't need.
21   Q. No training, but your personal experience?
22   A. Yes.
23   Q. Do you have any particular knowledge or
24 training in how to interface with families outside the

44

1 facility?
2   A. No.
3   Q. Does any of your training or knowledge include
4 reporting concerns directly to members of the family?
5   A. No.
6   Q. Is there anything in this "POSITION
7 DESCRIPTION," in the "ESSENTIAL JOB RESPONSIBILITIES"
8 category that requires you to report concerns directly
9 to family members?
10   A. No.
11   Q. In the three years and three months that you
12 worked as a resident aide at Wyngate, what experiences
13 did you have discussing appropriate care with families
14 of Alzheimer's patients?
15   A. Me personally, I had no -- I did not speak to
16 the family members about what the personal care was.
17       The family talked to me of their family
18 member's personal care.
19   Q. You didn't provide any instruction or advice to
20 them about what their care should be?
21   A. No.
22   Q. On how many occasions were you asked or did you
23 offer your opinion to family members about
24 relationships between residents?

Page 69

1  In this interrogatory we asked you to "Please
2  identify all instances where Defendant" -- and in this
3  case that would be you -- "reported alleged
4  Plaintiff's alleged failure to conduct itself in a
5  fiduciary capacity. For each instance, please
6  identify the alleged fiduciary duty was owned" -- I'm
7  sorry, "duty was owed by Plaintiff to any individual."
8  We asked you to talk about the date and more details.
9     In response to that you state that, "I reported
10 Plaintiff's failure to the female resident's daughter
11 in October of 2008 via telephone."
12    Now, do you know what "fiduciary capacity" is?
13 A. No.
14 Q. Okay.
15    Do you know why, when you were discussing here
16 about reports that you made, you identified the report
17 that you made about the female resident's daughter in
18 October of 2008 but you didn't identify this report to
19 Tammy Provenzano that you made with respect to the
20 hands-down-the-pants incident?
21 A. I thought it was talking about if there was any
22 reports that I made to her daughter.
23 Q. You thought that that question just asked for
24 reports to her daughter?

Page 70

1  A. To the family, yes.
2  Q. Okay.
3     Back to your counterclaim, that is document --
4  I apologize.
5     In Paragraph 6, you state that, "Upon learning
6  of the sexual relationship" -- that starts on Page 11.
7  A. Okay.
8  Q. "Upon learning of the sexual relationship,
9  Ms. Yates notified her supervisors at Wyngate of the
10 relationship and of her concerns that the female
11 resident was incapable of consenting to a sexual
12 relationship due to her condition."
13    You allege in that paragraph that you notified
14 supervisors, in the plural, of the relationship
15 between Eula Stoll and Robert Degenkolb after the June
16 incident; is that correct?
17 A. Yes.
18 Q. Okay.
19    Who are the other supervisors that you
20 notified?
21 A. Tammy was one of them, and then I spoke with
22 Jody when she was hired about the situation.
23 Q. "Jody when she was hired."
24    Do you know when that was?

Page 71

1  A. No.
2  Q. You spoke to Jody about this specific incident
3  with the hands down the pants?
4  A. No.
5     Of the situation that was going on.
6  Q. Under Paragraph 6 in your counterclaim, it
7  says, "Upon learning of the sexual relationship."
8     But you didn't notify Jody upon learning of the
9  sexual relationship; is that correct?
10 A. Yes.
11 Q. What did you notify Jody of?
12 A. We spoke to her about the situation that's on
13 hand, if her daughter actually knew of the situation,
14 how it was going.
15 Q. You say "we."
16    Who is "we"?
17 A. Me and another nurse that was there.
18 Q. Which nurse was that?
19 A. Candace Smith.
20 Q. You and Candace Smith discussed the Eula Stoll
21 and Robert Degenkolb situation with Jody when she
22 first came to work at Wyngate?
23 A. It was after. I don't know if it was exactly
24 when she was hired, but it was after she was hired.

Page 72

1  Q. Do you know how long it was after she was
2  hired?
3  A. No. I don't recall.
4  Q. Was it within a week?
5  A. I am not sure.
6  Q. Do you know where you discussed this with her,
7  do you recall?
8  A. In her office.
9  Q. In Jody's office?
10 A. Yes.
11 Q. Was anyone else witness to this conversation
12 besides Candace Smith?
13 A. No.
14 Q. What exactly did you say to Jody?
15 A. We were speaking with her about the situation,
16 about how we don't want them in each other's rooms,
17 how her daughter didn't want it, and that we don't
18 think her daughter knows the truth of the situation,
19 because if she did, she wouldn't let it go on.
20 Q. Why didn't you want Eula in Mr. Degenkolb's
21 room?
22    MR. RECHT: I'm sorry? I didn't hear what
23 you said.
24    MS. ABBOTT: I'm sorry.

**Page 89**

1      I am not sure if she called the hotline or not.
2   Q. Did she tell you what she reported?
3   A. I can't remember exactly what she said.
4   Q. Do you remember when she told you about making
5 these calls?
6   A. I'm trying to remember.
7      I don't know if it was Thursday or Friday, I
8 can't recall.
9   Q. Thursday or Friday of --
10   A. October.
11   Q. "October"?
12   A. Yes.
13   Q. That would be the 31st or the 30th, I guess,
14 Thursday, the 30th, Friday, the 31st?
15   A. I think so.
16   Q. Okay.
17      On Page 11 of your testimony, you state that --
18 "The nurses told the resident aides that under no
19 circumstances are they to be in the same room
20 together?"
21      I think that we have discussed this before.
22      Are there any particular nurses that you were
23 referring to when you gave this statement to
24 Mr. Wallace?

**Page 90**

1   A. No.
2   Q. You don't know who these nurses are?
3   A. No.
4   Q. Do you know who the aides were that heard these
5 nurses?
6   A. All of us.
7   Q. Were you told this personally?
8   A. No.
9   Q. In your statement you testified that you heard
10 about an incident that occurred on October 29th, 2008.
11      Is that correct?
12   A. Yes.
13   Q. Were you working on that day?
14   A. When the situation happened, no.
15   Q. "The situation" meaning October 29th, 2008.
16      Is that the date that you believe the situation
17 took place?
18   A. I believe, yes.
19   Q. Did you work on the 30th, the next day?
20   A. Yes.
21   Q. Did you work on Friday, the 31st?
22   A. Yes.
23   Q. Because you weren't working on the 29th, you
24 didn't personally witness the incident that allegedly

**Page 91**

1 occurred between Eula and Robert on the 29th; correct?
2   A. Correct.
3   Q. In your statement you were, simply, telling
4 Mr. Wallace about what you heard secondhand?
5   A. Yes.
6   Q. What did you hear about the incident on
7 October 29th, 2008?
8   A. That exactly what happened was one of the aides
9 saw Eula giving oral sex on him. Michelle Shonkweiler
10 saw it and reported it to CiCi, the nurse on hand, and
11 that they went and reported it to Debbie, and they
12 told me that Debbie said, "The next time you see this
13 to shut the door, come back later, see if they're done
14 and take them to their separate rooms."
15   Q. Who told you about this incident?
16   A. Michelle told me about it and a few other aides
17 told me about it.
18   Q. Michelle Shonkweiler told you directly about
19 this incident?
20   A. Yes.
21   Q. When did she tell you about it?
22   A. I don't recall.
23   Q. Was it when you came to work on the 30th?
24   A. I don't recall which day, because I don't know

**Page 92**

1 if she was working the 30th or not. But I spoke to
2 her about it.
3   Q. Now, I want to turn your attention to Page 13
4 of your statement to Mr. Wallace.
5   A. Okay.
6   Q. On Line 16 of Page 13, Mr. Wallace asked you,
7 after you describe the incident you just described to
8 us, "Now, what you've just described for me is stuff
9 that you've heard?"
10      You answered: "Yes."
11      Mr. Wallace, question: "Okay. Did you hear
12 any of that from Michelle or CeCe?"
13      Your answer: "No."
14      "Who did you hear this from?"
15      Answer: "I heard it from the aides that was on
16 the shift. I heard it from Latoya and Heather," and
17 then that phrase goes on.
18      Now, just a moment ago you testified that you
19 heard this from Michelle directly, but you told
20 Mr. Wallace, on November 14th of 2008, that you did
21 not hear this from Michelle.
22      MR. RECHT: Objection.
23      I think that misstates what she said.
24      You can go ahead and answer.

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844     800.914.DEPO (3376)

Page 93

1  A. At that time I don't recall why I said no, but
2  I do recall speaking to Michelle about the situation.
3  Q. You recall that now but you did not recall that
4  on November 14th of 2008?
5  A. Yes.
6  Q. When did you recall that you talked to
7  Michelle Shonkweiler about this incident?
8  A. Shortly after -- it was right after the
9  situation that I spoke to a lot of people from Wyngate
10 about everything, so it was from the time at work I
11 was speaking to everybody at Wyngate and after
12 Wyngate.
13 Q. Would it have been after November 14th, 2008,
14 when you gave the statement to Mr. Wallace, that you
15 spoke to Michelle Shonkweiler?
16 A. No.
17 Q. You don't recall when it was that you spoke to
18 her?
19 A. No.
20 Q. What did Michelle tell you exactly that she
21 saw?
22 A. Well, we didn't really go into what she saw.
23 We were mostly talking about what Debbie said.
24 Q. She did not tell you what she saw?

Page 94

1  A. We didn't completely talk about it, no.
2  Q. What did she tell you that she saw?
3  A. That she went down there and the situation that
4  we were speaking about was going on -- I'm sorry.
5  I'm trying to remember everything.
6  Q. That's okay.
7  A. When I was speaking with Michelle we were
8  talking about pretty much all of the situations and
9  what came to that one point of her and Cece seeing
10 that down there. But what she was mostly speaking
11 about is how Debbie mentioned to shut the door and
12 walk away. That was mostly the thing we were talking
13 about, me and Michelle.
14 Q. Did Michelle tell you that she saw
15 Robert Degenkolb receiving oral sex from Eula Stoll?
16 A. I can't recall the whole conversation from word
17 to word.
18 Q. Do you recall that portion of it?
19 A. No.
20 Q. Do you recall her mentioning any kind of oral
21 sex?
22 A. Yes. She mentioned that she saw oral sex, but
23 then we started talking about Debbie.
24 Q. Do you remember when she told you that she saw

Page 95

1  oral sex?
2  A. No, I can't recall which day it was.
3  Q. Did you speak to Cece McClory about the
4  incident?
5  A. No.
6  Q. What did Michelle Shonkweiler tell you about
7  what she heard from -- I'm sorry. Was it Jody or
8  Debbie?
9  A. Debbie.
10 Q. What did she tell you exactly, to the best of
11 your recollection, that Debbie told her?
12 A. Debbie told Cece that the next time you see
13 this, to shut the door and to come back later, see if
14 they're done, then take them to their room.
15 Q. She told you that Debbie told Cece?
16 A. Uh-huh.
17 Q. Was Michelle a witness to what Debbie told
18 Cece?
19 A. That, I don't know. I was not there.
20 Q. You don't know if Debbie told Cece this in the
21 presence of Michelle?
22 A. No.
23 Q. You don't know if Debbie told this to Michelle
24 directly?

Page 96

1  A. No.
2  Q. You weren't present when Debbie made this
3  alleged statement to Cece; correct?
4  A. Correct.
5  Q. But at some point Michelle told you that Debbie
6  told Cece that they were to shut the door and walk
7  away, essentially?
8  A. Yes.
9  Q. You didn't recall any of this when you gave
10 your statement to Mr. Wallace on November 14th of
11 2008?
12 A. Yes.
13 Q. Were you aware that -- first off, have you seen
14 the statement that Ms. McClory provided to Wyngate
15 with respect to October 29th, 2008?
16 A. No.
17 Q. You are aware that Ms. McClory notified the
18 Director of Nursing in her chain of command; correct?
19 That would be Deb.
20 A. About when she went to the office and told her
21 about it, yes.
22 Q. You were aware of that prior to your call to
23 Ellen Hughes on November 28 -- or, November 1st, 2008;
24 correct? I'm sorry.

Page 105

1  administrator tell anyone else that they should close
2  the door and walk away?
3  A. No.
4  Q. Did any nurses or administrators tell you that
5  Eula and Robert were not to be in each other's rooms?
6  A. Personally?
7  Q. Yes.
8  A. No.
9  Q. On Page 16 of your statement, you say that
10 you've heard sexual contact has happened a few times.
11 I just want to be sure that we have reviewed all of
12 the times that you were referring to here.
13       Are there any other incidents that you have
14 heard about?
15 A. Besides the ones that we spoke about?
16 Q. Yes.
17 A. No.
18 Q. I want to talk to you a little bit about the
19 policies for reporting patient care concerns.
20       Before we get into specifics, why don't you
21 tell me, generally, about how you were trained to
22 report abuse and neglect?
23 A. Abuse and neglect?
24 Q. Yes.

Page 106

1  A. I don't recall exactly learning how to report
2  it.
3        I just know if something happened, you are
4  supposed to report it to the nurse that is on shift.
5  Q. Did you receive any training when you first
6  began working at Wyngate?
7  A. For?
8  Q. On how to report patient concerns.
9  A. No.
10 Q. You didn't receive any training?
11 A. No, not as far as I can recall.
12 Q. Did you receive any training during the course
13 of your employment on how to report patient concerns?
14 A. We had classes on -- we had all different types
15 of classes. We had classes on how to wear gloves
16 right, how to lift them and --
17 Q. Were you ever trained about abuse prevention
18 and reporting and the role of the ombudsman (handing)?
19       THE REPORTER: Did you want me to mark
20 that?
21       MS. ABBOTT: I'm sorry.
22       Yes.
23       (Whereupon, Deposition Exhibit No. 12 was
24 marked for identification.)

Page 107

1       THE REPORTER: That's No. 12.
2  BY MS. ABBOTT:
3  Q. Let me ask you this: Do you recognize the
4  document that is in front of you?
5  A. Yes.
6  Q. Is that your signature at the bottom?
7  A. Yes.
8  Q. That's dated 8/17/06?
9  A. Yes.
10 Q. Okay.
11      The last paragraph on the bottom says, "I have
12 been informed about Wyngate's complaint procedure,
13 abuse prevention and reporting and the role of the
14 ombudsman."
15      Is that your initials to the left of that?
16 A. Yes.
17 Q. What were you informed about Wyngate's
18 complaint procedure, abuse prevention and reporting
19 and the role of the ombudsman?
20 A. I don't recall what it was.
21 Q. Okay.
22      Are you familiar with the Community Guidebook
23 that we looked at earlier during the deposition?
24 A. Yes.

Page 108

1  Q. Can you turn to Pages 17 and 18 in this
2  guidebook?
3  A. Okay.
4  Q. Okay.
5        At the bottom of Page 17 in this guidebook, it
6  states that, "Employees are required by law to
7  immediately report to management any form of abuse
8  that is observed, giving the name of the resident, the
9  employee involved, the time, date, place and a
10 description of what occurred."
11       Did you understand that to be the policy at
12 Wyngate?
13 A. Yes.
14 Q. Now, on Page 17 of your statement, you
15 reference the policy guidebook on Line Nos. 6 and 7 --
16 I'm sorry.
17       On line No. 2 Mr. Wallace is referring to a
18 "close the door and walk away policy." He asked you
19 if that is something you are trained to do and you say
20 "No" on Page 17.
21 A. Yes.
22 Q. Then he asked you if that's something in the
23 policy guidebook.
24       Is the policy guidebook the same as the policy

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844    800.914.DEPO (3376)

109

1 and procedures binder?
2  A. I'm not sure.
3  Q. What is the policy guidebook that you're
4 referring to?
5  A. I'm not sure.
6     The only guidebook that I brought to him was to
7 show the grounds for me to call the family members.
8  Q. What was that that you brought to show the
9 grounds to call the family members?
10 A. The employee handbook.
11 Q. Can you recall where in that employee handbook
12 it tells you to call family members?
13 A. No, I can't recall.
14 Q. Do you want to take a look through that?
15    Take your time.
16    (Brief pause.)
17 A. Page 17.
18 Q. Uh-huh.
19 A. This, "Current employees may not contact
20 residents or resident family members unless on duty or
21 as part of their individual job duties. Any other
22 circumstances require permission from the Resident
23 Manager."
24 Q. Okay.

110

1     Now, let's go back to your job description that
2 we referenced earlier.
3     Is there anything -- that should be one of the
4 documents that you have, your "POSITION DESCRIPTION."
5  A. Which one am I looking for again?
6  Q. It should say "POSITION DESCRIPTION" on it.
7     MS. WELCH: That one (indicating).
8  A. Okay.
9  Q. Okay.
10    Did you contact the family of Eula Stoll while
11 you were on duty?
12 A. Yes.
13 Q. What about your individual job duties do you
14 believe required or permitted you to contact
15 Ms. Hughes?
16 A. None of my job duties required me to call her.
17 Q. Was it part of your job duties to contact
18 residents' families directly about patient concerns?
19 A. No.
20 Q. Did you receive permission from the Resident
21 Manager to contact Eula Stoll's family?
22 A. No.
23 Q. Okay.
24    On Page 17 of your statement, you testified

111

1 that this policy guidebook "says in there if there's
2 any, like, sexual abuse or anything like that, to go
3 to the head manager and report it to her, report it to
4 the nurse, like I said, to follow the chain of
5 command, to let everybody know what happened, which it
6 was."
7     Is there any part of this guidebook that tells
8 you to follow the chain of command?
9  A. Not as far as I recall, but my position as an
10 aide was to report to a nurse and the position of the
11 nurse had to report to the head nurse and the head
12 nurse would report to Debbie, the boss position.
13    That's how I saw following the chain of the
14 command.
15 Q. Okay.
16    That was your understanding about what you were
17 to do when you had concerns about patients?
18 A. Yes.
19 Q. Is there anything in the policy that says that
20 you are to let everybody know what happened?
21 A. Not as far as I know.
22 Q. Okay.
23    Are you familiar with the policy and procedures
24 binder that is available for the review of the aides?

112

1  A. Yes.
2     MR. RECHT: I wasn't nodding at you.
3     I was nodding at her.
4     MS. ABBOTT: Oh. Okay.
5     MR. RECHT: I'm sorry.
6     MS. ABBOTT: No problem.
7     (Whereupon, Deposition Exhibit No. 13 was
8 marked for identification.)
9  BY MS. ABBOTT:
10 Q. There you go (handing).
11    Do you recognize the document that I've put in
12 front of you?
13    (Brief pause.)
14 BY MS. ABBOTT:
15 Q. Does that document look familiar to you?
16 A. I don't recall this document, reading this, but
17 I may have.
18 Q. Does this look like the kind of document that
19 was kept in the policies and procedures binder?
20 A. I don't recall.
21 Q. Okay.
22    As far as the policy itself goes, is this the
23 policy that was reviewed with you during your annual
24 review of policies and procedures?

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844           800.914.DEPO (3376)

117

1 Licensure and Certification?
2 A. No.
3 Q. Are you familiar with OHFLAC?
4 A. No.
5 Q. Are you familiar with the individuals that come
6 into the facility on a regular basis to do inspections
7 to make sure that Wyngate is compliant with the laws
8 in West Virginia with respect to --
9 A. The State inspection, yes.
10 Q. Okay.
11 Are you familiar with the fact that there are
12 laws about reporting situations involving abuse and
13 neglect of patients in assisted living facilities?
14 A. I do not -- can you repeat that question again?
15 Q. Sure.
16 Are you familiar with the fact that there are
17 laws with respect to the reporting of abuse and
18 neglect of residents in assisted living facilities?
19 A. Yes.
20 Q. If you could, turn one more page on that,
21 please, to the page that says, "REPORTING OF ADULT
22 ABUSE, NEGLECT OR EMERGENCY SITUATIONS."
23 A. Okay.
24 Q. Are you familiar with the "REPORTING

118

1 PROCEDURES" at the bottom of this page?
2 MR. RECHT: Which page?
3 MS. ABBOTT: Page 1. I'm sorry. It's not
4 the first page, but it's Page 1.
5 MR. RECHT: The next page.
6 The highlighted portion?
7 MS. ABBOTT: I'm sorry. She has got my
8 copy.
9 Yes, the highlighted portion is fine.
10 A. No, I don't recall this.
11 Q. Okay.
12 You were not aware that there was a statewide
13 hotline number to call to report abuse or neglect?
14 A. No.
15 Q. None of that information was posted in the
16 break room at Wyngate?
17 A. There might have been, but I don't recall.
18 Q. You don't recall if there were any telephone
19 numbers posted in the break room at Wyngate for
20 calling to report abuse or neglect of a patient?
21 A. There was things hanging in the break room but
22 I don't recall what they said.
23 Q. Were you ever given training that there were
24 telephone numbers you could call to report abuse and

119

1 neglect?
2 A. I know there was questions that need to be
3 answered to read some of the stuff in the break room
4 but I never really read anything.
5 Q. You knew that you were supposed to read the
6 things in the break room but you never really did?
7 A. At first I did, then after a year I just didn't
8 read no more unless I had to.
9 Q. At first you knew that there were numbers
10 posted in the break room for you to call to report
11 abuse and neglect of a resident?
12 A. Not as far as I can recall, because I don't
13 remember.
14 Q. Okay.
15 Are you aware of any reporting policy that
16 permits or requires you to call the families of
17 residents directly about patient care concerns?
18 A. No.
19 Q. Are you familiar with a Resident Bill of
20 Rights?
21 A. Yes.
22 Q. "Yes"?
23 A. Yes.
24 Q. Is the Resident Bill of Rights posted in the

120

1 break room?
2 (Whereupon, Deposition Exhibit No. 16 was
3 marked for identification.)
4 THE REPORTER: That is 16.
5 BY MS. ABBOTT:
6 Q. I'm sorry. I didn't hear your answer.
7 Did you say "yes" or "no" to that?
8 A. I didn't recall.
9 I was looking at it first.
10 Q. Oh. Okay.
11 A. I don't recall if this was in the break room or
12 not.
13 Q. Okay.
14 Can you turn to the third to the last page of
15 this document -- okay, that's wrong.
16 The fourth to the last page of this document.
17 A. Yes.
18 Q. Is the "Posting of Information & General
19 Information for Residents" contained on this page
20 posted in the break room at Wyngate?
21 A. I don't recall.
22 Q. Are you familiar with the ombudsman's office?
23 A. No.
24 Q. Have you ever heard the term "ombudsman's

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844          800.914.DEPO (3376)

125

1   with Ellen that she didn't know before you asked her?
2   A. Because I asked her. Before I told her
3   anything, I asked her what does she know of the
4   relationship and she explained to me of what her
5   extent of knowledge meant, the relationship was,
6   before I told her anything that was going on.
7   Q. Prior to making the telephone call to
8   Ellen Hughes, you did not know whether she knew or
9   not; is that correct?
10  A. Correct.
11  Q. Did you ask anyone what action Wyngate was
12  taking with respect to the report of Michelle to Cece
13  to Deb Petras?
14  A. No.
15  Q. Yet instead of reporting yourself up the chain
16  of command your concerns, you went directly to Ellen
17  Hughes with your phone call on November 1st, 2008; is
18  that correct?
19  A. I'm trying to answer this the right way.
20      It was followed, the chain of command was
21  followed, by numerous people and nothing was done,
22  that's why I called the daughter.
23  Q. Was the chain of command followed by you?
24  A. No.

126

1   Q. Who were the numerous people that followed the
2   chain of command?
3   A. Quite a few aides.
4   Q. Who were the aides?
5   A. I told you earlier that the aides had spoken to
6   the nurses.
7       If the chain of command was not followed, then
8   how did everybody in the office know about it?
9   Q. Did you witness anyone speak to either
10  Deb Petras or Jody Bowden, a wellness manager or a
11  director -- I'm sorry, an administrative employee
12  about complaints about Robert Degenkolb and
13  Eula Stoll?
14  A. Just when me and Candace was speaking to Deb --
15  not Deb. Excuse me. Jody.
16  Q. "Jody"?
17  A. Uh-huh.
18  Q. You never made any mention of that to
19  Mr. Wallace in November of 2008; correct?
20  A. No.
21  Q. Okay.
22      On Page 23 of your statement you -- this is
23  Friday, the 31st, you are discussing the situation --
24  I'm sorry. On Line 16 you say, "And then Saturday it

127

1   kept getting talked about. And Erin Murphy was like,
2   'If I seen it, I would call, call her daughter, and
3   tell her daughter.' And I was like, 'I've seen one.'"
4       What is the "one" you're referring to?
5   A. Where her hands was down his pants.
6   Q. Okay.
7       Did you ever discuss any of these incidents
8   that you and I have talked about with Robert Degenkolb
9   directly?
10  A. No.
11  Q. Why not?
12  A. Because I didn't think it was my position to
13  say anything.
14  Q. It wasn't your position to talk to Robert, who
15  you provide care for; correct?
16  A. Correct.
17  Q. But you did feel it was your position to
18  contact Eula Stoll's family directly?
19  A. Yes.
20  Q. You mention in that same section that
21  Tammy Young is another one that saw it with her own
22  eyes. That's actually on Page 24.
23      Who are the other ones that you are referring
24  to here?

128

1   A. Well, the other one that saw the hands down the
2   pants and then the ones that saw the situation, the
3   very last situation, where she was giving oral sex.
4   Q. Just to be clear, the only people who have
5   witnessed incidents between Eula and Robert that you
6   are aware of, that have witnessed it firsthand, are
7   you, Michelle and Cece?
8   A. Yes.
9   Q. That's correct?
10  A. Yes.
11  Q. Okay.
12      Did Michelle tell you that she witnessed oral
13  sex?
14  A. Yes.
15  Q. There are no other ones, other than --
16  A. Well, there is.
17      Tammy Young, and then there is the one that saw
18  the other incident like me, but I can't remember who
19  it was.
20  Q. Right.
21      We don't know the name of that person?
22  A. Yes.
23  Q. During the conversation on Saturday that you
24  are referencing on Page 23, you said, "I've seen

**129**

1  one" -- excuse me. "I've seen one. But I'll call
2  her, I don't care. And they were like, Well, you
3  might get in trouble."
4      You understood at that point in time that you
5  might get in trouble for calling Ellen Hughes?
6      A. Yes.
7      Q. That's because it was not part of the proper
8  reporting policy; correct?
9      A. All I know is I looked into the handbook and it
10  said that if I was on duty and I can use the employee
11  phone, that I can call a resident's family member.
12  That's why I did.
13      Q. Is this the same section we were referring to
14  earlier in the employee handbook?
15      A. I'm pretty positive, yes.
16      Q. On Page 17?
17      A. Yes.
18      Q. Doesn't that section also say if it's part of
19  your job duty?
20      A. Yes.
21      Q. You testified earlier that it was not part of
22  your job duty; correct?
23      A. Yes.
24      Q. Then it would not be the proper reporting

*JAMIE J. BELFIORE, C.C.R.*
PA - 724.746.9844        800.914.DEPO (3376)

**130**

1  procedure; correct?
2          MR. RECHT: What portion are you referring
3  to?
4          MS. ABBOTT: I think it was Page 17, the
5  highlighted section.
6      A. This says, "resident family members unless on
7  duty or as part of their individual job duties."
8      It says "or".
9      Q. This is the section of the policy that you're
10  referring to?
11      A. Yes.
12      Q. Now, let's talk about your actual call to Ellen
13  Hughes.
14      When did you call her?
15      A. I called her on Saturday.
16      Q. Who did you tell that you were going to call
17  her?
18      A. Everybody knew. Kathy knew, Latoya knew,
19  Heather knew.
20      Q. Kathy Estep?
21      A. Yes.
22      Q. Latoya --
23      A. Johnson.
24      Q. "Johnson"?

*JAMIE J. BELFIORE, C.C.R.*
PA - 724.746.9844        800.914.DEPO (3376)

**131**

1      A. I think her last name is Johnson, yes.
2      Q. Okay.
3          You were only able to leave a message for her;
4  correct?
5      A. Yes.
6      Q. What was the message that you left?
7      A. "This is Gabby, a resident aide at Wyngate, and
8  I am calling. Would you please call me back at
9  Wyngate as soon as you can?"
10      Q. Did she call you back?
11      A. Yes.
12      Q. That was the extent of the message you left?
13      A. As far as I recall, yes.
14      Q. Did she call you back?
15      A. Yes.
16      Q. Now, what, to the best of your recollection,
17  exactly did you tell Ellen Hughes?
18      A. Well, she got on the phone and I told her I'm
19  sorry for calling her, but I just wanted to ask her a
20  question on how far and the extent of the relationship
21  did she know of her mother and Robert.
22          She started going into explanations of where
23  they hold hands and they go to exercise together, he
24  helps her at meals and they hold hands, he reads to

*JAMIE J. BELFIORE, C.C.R.*
PA - 724.746.9844        800.914.DEPO (3376)

**132**

1  her and, as far as she knows, that they're not
2  supposed to be in each other's rooms.
3      Q. What else did you tell her?
4      A. Well, I was like, "That's as far as you know?"
5          She said, "Yes."
6          I said, "Well, here's some incidents I wanted
7  you to know."
8          I started with the incident that I saw. She
9  started to get upset. I said, "Ellen, I'm not done
10  yet." I went to even tell her about the most recent
11  incident that happened, that they walked in and saw
12  Ellen giving oral sex on Robert, and she started
13  getting very, very upset.
14          I told her, "It's not over yet because when
15  they went and reported it to Debbie, Debbie told them
16  to shut the door and walk away and come back later and
17  see if she was okay" -- "see if they were done and
18  then take them to separate rooms."
19          She was very, extremely upset with the
20  situation.
21      Q. Did you tell her that you didn't personally
22  witness --
23      A. Yes.
24      Q. You told her that you personally witnessed the

*JAMIE J. BELFIORE, C.C.R.*
PA - 724.746.9844        800.914.DEPO (3376)

### Page 133

1  incident on October 29th?
2  A. Yes.
3  Q. You told her that her mother was performing oral sex on this gentleman, but you did tell her that
5  you did not witness that?
6  A. Yes.
7  Q. You told her that you did not witness the
8  report made by either of the people who witnessed it;
9  is that correct?
10 A. Yes.
11 Q. You told her that you did not actually witness
12 the fact that Deb Petras told them to close the door
13 and walk away?
14 A. Yes.
15 Q. Okay.
16    Have you ever made any other type of phone
17 calls like this to any other residents?
18 A. No.
19 Q. Have you ever called any residents' families at
20 home?
21 A. No.
22 Q. Are you aware of other employees that call
23 families of residents at home?
24 A. No.

### Page 134

1  Q. Okay.
2     It's your understanding that the policy is you
3  are permitted to call family residents at home for any
4  reason?
5  A. Not for any reason, no.
6  Q. For what reason are you permitted to call
7  residents at home?
8  A. I don't know what would give us permission to
9  call the family members at home.
10    I just felt like that I needed to.
11 Q. This policy that we have been talking about,
12 this doesn't tell you that you are permitted to call
13 family residents at home to report abuse; correct?
14 A. It does not say that in there.
15 Q. Okay.
16    Did you tell Ellen Hughes that everyone was
17 discussing the incident between her mother and
18 Robert Degenkolb?
19 A. I don't recall.
20 Q. Did you tell her that there were only three
21 people who had actually witnessed contact of a sexual
22 nature between her mother and Robert Degenkolb?
23 A. I told her that Michelle and Cece knew.
24 Q. You identified who saw the incident on

### Page 135

1  October 29th?
2  A. Yes.
3  Q. Other than the hands-down-the-pants incident,
4  you didn't have firsthand knowledge of anything that
5  you told Ellen Hughes; is that correct?
6  A. Correct.
7  Q. The one thing you did have firsthand knowledge
8  of, you waited four-and-a-half months to report to
9  her?
10 A. Yes.
11 Q. Did you tell her why you waited to report it to
12 her?
13 A. I told her that under what we understood, that
14 she knew what was going on. And she was very upset
15 that we would even consider that she knew what was
16 going on.
17 Q. In your counterclaim, in Paragraph 8 -- let me
18 find that.
19    You claim you made the call -- that's on
20 Page 11.
21    THE DEPONENT: This (indicating)?
22    MR. RECHT: No.
23    I have got it (handing).
24    ---

### Page 136

1  BY MS. ABBOTT:
2  Q. You claim you made the call to Ellen Hughes
3  because you were concerned about Eula Stoll's health
4  and safety.
5     Can you describe for me how you were concerned
6  about her health?
7  A. Her health and safety, that if it kept on
8  going, how far he would go with her.
9  Q. What does that mean?
10 A. That her health would be -- I don't know even
11 if it would mess with her health, I'm not sure,
12 because I'm not a doctor, but if it wasn't taken care
13 of now, how far he would have gone, done something to
14 her.
15    It started with the hands down the pants to
16 oral sex. What would happen when no one saw anything.
17 Q. How about her safety, how were you concerned
18 about her safety?
19 A. I don't know.
20 Q. Did you think that she was in danger of injury?
21 A. Physical injury, no.
22 Q. Did you think she was in danger of mental
23 injury?
24 A. I'm not sure if that would cause some medical

137

1 injury or not.
2 Q. I actually said "mental injury."
3 A. Oh.
  I'm sorry.
5 Q. That's okay.
6 Did you think that she was in danger of any
7 mental injury?
8 A. I'm not sure.
9 Q. Do you have any qualifications to determine
10 whether or not she would be at risk of mental injury?
11 A. No.
12 Q. Let me confirm that.
13 In your mind, you felt this was wrong; is that
14 correct?
15 A. Yes.
16 Q. It was wrong for them to have sexual contact?
17 A. Yes.
18 Q. But this is just your opinion and you don't
19 have any training with respect to sexual contact
20 between Alzheimer's patients or dementia patients?
21 A. Yes.
22 Q. Before you made the call to Ellen, did you
23 consider what effect a phone call with second or
24 thirdhand information about her mother giving oral sex

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844        800.914.DEPO (3376)

138

1 to other residents might have when you never actually
2 saw this occurring yourself?
3 A. Yes.
4 Q. What did you think about?
5 A. That I'm going to lose my job.
6 Q. I'm sorry?
7 A. That I'm going to lose my job.
8 I'm sorry.
9 Q. Did you think about the effect it might have on
10 Ellen?
11 A. Effect on Ellen?
12 Q. Yes.
13 A. In the long run it would be positive.
14 Q. Since you didn't witness it yourself, did you
15 consider what the impact would be if it turned out
16 that her mother didn't, in fact, perform oral sex on
17 Robert Degenkolb?
18 A. It wasn't the first time I heard of any kind of
19 situation. It's not like I went down to the phone and
20 picked up the phone the first thing I heard --
21    THE REPORTER: I'm sorry?
22    THE DEPONENT: I'm sorry.
23    THE REPORTER: I couldn't understand.
24    MS. ABBOTT: Do you need a minute?

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844        800.914.DEPO (3376)

139

1    MR. RECHT: Just give her a minute.
2    (Brief pause.)
3    MR. RECHT: Okay?
4    THE DEPONENT: Yes.
5 A. I said it's not like it was the first thing I
6 heard and I went straight down and called her
7 daughter.
8 It has been a conversation that has been going
9 on for months and even if it may be heard down the
10 line that something happened, I saw one incident. It
11 kept on repeating. I couldn't even stand to hear
12 another situation happen so it had to -- the only way
13 I could think that something could happen is if I
14 called, because nothing else was being done.
15 Q. Gabby, how do you know that nothing else was
16 being done after that October 29th incident?
17 A. Personally, when another resident would fall,
18 okay, the nurse would be right on the phone with their
19 family members saying, "Your father fell," "Your
20 mother fell," "Your mother did this."
21 It happened Wednesday, this is Saturday and her
22 daughter still has not been informed. When it is
23 protocol if something happened to a resident to call
24 their -- what is that called? The legal power of

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844        800.914.DEPO (3376)

140

1 attorney, which the nurses did when a resident would
2 fall and scrape their knee, but they would not call
3 that day when the situation happened to tell her
4 daughter.
5 If they called that day, if her daughter knew
6 that day, then why wasn't anything done? Come
7 Saturday it's still going on, she is still living
8 there and the daughter didn't know.
9 That's just how I feel. I'm sorry.
10 Q. Let me ask you this: You knew about the
11 situation from Michelle Shonkweiler, correct?
12 A. Correct.
13 Q. Although you didn't testify to that back in
14 November of 2008, today is the first time that you
15 have testified that you heard about the situation
16 directly from Michelle Shonkweiler; is that correct?
17 A. Yes.
18 Q. Today you're telling us that you have
19 secondhand knowledge of the situation, that it was
20 reported to Deb Petras that oral sex was performed
21 on Robert Degenkolb by Ellen Hughes' mother?
22 A. Yes.
23 Q. When you placed the call to Ellen Hughes,
24 before you asked her on the phone you were not aware

JAMIE J. BELFIORE, C.C.R.
PA - 724.746.9844        800.914.DEPO (3376)

of whether or not Deb Petras or anyone from Wyngate had contacted Ms. Hughes; is that correct?
A. **To my knowledge, they did not call.**
Q. You were not aware if any investigation was being conducted with respect to the October 29th, 2008 incident; is that correct?
A. **That's correct.**
Q. You never asked Deb Petras about the October 29th, 2008 incident; did you?
A. **No.**
Q. You didn't ask Jody Bowden about the October 29th, 2008 incident?
A. **No.**
Q. Did you ask Cece McClory about the October 29th, 2008 incident?
A. **No, because I did not see her from the time I got terminated.**
Q. You didn't ask her about it any time between October 29th, 2008, and November 1st; is that correct?
A. **I haven't seen her. No.**
Q. But you're telling us today that you did speak with Michelle Shonkweiler about it?
A. **Yes.**

Q. Today is the first time that you have testified that you were told about it by Michelle Shonkweiler; correct?
A. **Yes.**
Q. You testified on Page 37 of your statement to Chris Wallace that it has to be your job to report to resident's family members.
A. **Where was that?**
Q. That is on Line 5 on Page 37.
Is that correct?
A. **Yes.**
Q. Okay.
I assume you are referencing again the policy in the Community Guidebook?
A. **Yes.**
Q. On Line 6 you say, "Like, if it's specifically towards you, that's the only time you're allowed to call them."
What did that mean?
A. **To back it up to Line 3 through Line 7, "Yes. You have to be on duty and you have to use the employee's phone to call the resident's family members, or it has to be your job to do that. Like, if it's specifically towards you, that's the only time**

**you're allowed to call them."**
Q. Can you explain what you meant by Lines 6 and 7, "Like, if it's specifically towards you, that's the only time you're allowed to call them"?
A. **That if it came from one of the bosses, that it is your -- this would be your task, to call the family member daily to let them know how their family member is doing. You would have to be told to do it.**
Q. That would be, in essence, part of your job, to do that if you're told?
A. **Yes.**
Q. This wasn't part of your job; correct?
MR. RECHT: Objection. Objection to the form of the question.
Go ahead and answer.
BY MS. ABBOTT:
Q. Was it part of your job to call families of residents?
A. **What was that?**
Q. Was it part of your job to call families of residents directly?
A. **No.**
Q. Okay.
The way you see this policy, when would it be

appropriate for you to call a family resident?
MR. RECHT: Objection.
Asked and answered.
Go ahead.
A. **I don't know when it would be proper to call.**
Q. Did you talk to Ellen Hughes after the initial phone call you made to her on November 1st?
A. **On my personal phone?**
Q. At any time.
A. **We spoke occasionally.**
Q. How soon did you talk to her after the initial phone call that you made on November 1st?
A. **I can't recall.**
Q. Was it the same day?
A. **No.**
Q. Would it have been the next day?
A. **I can't recall.**
**There was quite a few.**
Q. How many phone conversations have you had with Ellen Hughes?
A. **I haven't talked to Ellen Hughes for over a year, so it has been a while.**
Q. How many phone conversations did you have with her between November 1st and since you last talked

145

1 with her?
2 A. I can't recall.
3 Q. Would it be five?
4 A. I can't recall exactly how many times I spoke
5 with her.
6 Q. What did you speak with her about in those
7 subsequent phone calls?
8 A. Different situations of what's going on.
9 Q. Can you explain that a little bit more for me?
10 A. About Wyngate events and her mother, her
11 situation.
12 Q. What did you talk to her about? Wyngate?
13 A. What we have spoken of.
14 Q. Did you speak to her about any other incidents
15 that occurred at Wyngate?
16 A. No.
17 Q. What was the purpose of those continuing phone
18 calls?
19 A. That she kept calling me and I answered the
20 phone and spoke with her.
21 Q. Ellen called you?
22 A. Yes.
23 Q. Why did she call?
24 A. To speak with me to see if I'm okay, to thank

146

1 me.
2 Q. She was calling to talk about you?
3 A. Me and her mother, yes.
4 Q. What was she calling to talk to you about her
5 mother after the 1st of November?
6 A. The situation of Wyngate that we just spoke
7 about.
8 Q. What did she want to know?
9 A. We were just continually talking about the
10 situation that was happening at Wyngate, that she felt
11 really bad that everybody thought that she knew and
12 she didn't.
13 Q. Did you talk to her about any incidents other
14 than the Tammy Young incident that we discussed with
15 the pulling down of the pants, the hands down the
16 pants incident with the person that you don't recall
17 who told you, the incident before where they observed
18 Robert's -- I'm sorry, Eula's hands down Robert's
19 pants and the incident of October 29th, 2008?
20 A. No.
21 Q. When did Ellen Hughes tell you that she got a
22 detective?
23 A. I can't recall exactly.
24 Q. Did she tell you why she got a detective?

147

1 A. I can't recall.
2 Q. Did she tell you that she made a report to the
3 police?
4 A. I can't recall who made the report to the
5 police.
6 Q. What did she tell you -- I'm sorry. Strike
7 that.
8 When did she tell you that she got an attorney?
9 A. Right after, because I went and spoke to him.
10 Q. Right after when? I'm sorry.
11 A. My termination.
12 Q. She told you that she got an attorney right
13 after your termination?
14 A. Pretty much.
15 I don't know exactly when she got one, but if
16 you can read -- I spoke to the attorney, so it was
17 pretty much within 10 to 14 days since I got
18 terminated.
19 Q. Okay.
20 She would have told you that she got an
21 attorney during one of those conversations after the
22 1st of November?
23 A. Yes.
24 Q. On Page 37 you said that you checked the

148

1 employee handbook before you made the call to Ellen.
2 I just want to confirm that you're referencing again
3 the Community Guidebook.
4 Is that correct?
5 A. Yes.
6 Q. When you left a message for Ellen, did you ask
7 her to call back and speak with a nurse or an
8 administrator or someone in management?
9 A. No.
10 Q. Why not?
11 A. Because I wanted to speak with her.
12 Q. Did you think that you were more qualified to
13 discuss these issues with Ellen than a nurse or
14 administrator?
15 A. No, but I believe that I was going to tell her
16 what was going on.
17 Q. How exactly did you follow the chain of command
18 before you contacted Ellen Hughes directly?
19 A. Personally? Follow the chain of command
20 myself?
21 Q. Yes.
22 A. Well, I spoke to Tammy. I spoke to Jody. And
23 I can't say 100 percent that anybody spoke to Debbie,
24 but it was known that she knew, too. Still it's not

149

1 personal, but there was a lot of people that called
2 corporate so I know the chain of command was went
3 through.
4    Q. My question, though, is: How did you follow
5 the chain of command with respect to the October 29th,
6 2008 incident?
7    A. I told Tammy and I told Jody.
8    Q. I assume when you say you told Tammy, you're
9 referring to telling Tammy back when Tammy was still
10 employed there about the hands-down-the-pants
11 incident?
12    A. Yes.
13    Q. With Jody, the conversation with Jody was when
14 Jody first started working at Wyngate you discussed
15 the Eula Stoll incident broadly; is that correct?
16    A. We were just speaking of the situation that was
17 going on and trying to talk to her about if her
18 daughter truly knew or not. I mean, I went to two
19 head nurses.
20    Q. You didn't go to any head nurses or any nurses
21 with respect to the October 29th, 2008 incident; is
22 that correct?
23    A. No, because nurses spoke to me about it.
24    Q. Which nurses spoke to you about it?

150

1    A. Well, Kathy Estep and Erin Murphy -- sorry.
2 She was an AMAP.
3    Q. What did Kathy Estep tell you?
4    A. As we spoke earlier, we all was talking in one
5 conversation.
6    Q. Did you tell Kathy Estep or any other nurse or
7 administrator that you were concerned that nothing was
8 being done about the October 29th, 2008 incident?
9    A. Yes.
10    Q. Who did you tell that to?
11    A. We was speaking and everybody was concerned
12 that nothing was done.
13    Q. Which nurse did you report that to?
14    A. Kathy.
15    Q. When did you report this to Kathy?
16    A. When we were talking on Saturday that everybody
17 had concerns, I had concerns, Kathy had concerns,
18 Latoya had concerns, Heather had concerns, everybody
19 had concerns that it was already Saturday and nothing
20 had been done about it.
21    Q. Are you aware of anyone that called the
22 corporate hotline called Adult Protective Services,
23 called the OHFLAC abuse lines that we referenced
24 earlier or any other outside agency to report any of

151

1 this conduct between October 29th and the time of your
2 termination?
3    A. I don't know exactly who they called, but I
4 know Nancy, she called corporate to speak to them.
5    Now, Heather told me she called, but I don't
6 know if that was before or after the 29th.
7    Q. Just to be clear, you didn't call any of those
8 numbers?
9    A. No.
10    Q. Did you tell anyone about your phone call to
11 Ellen Hughes?
12    A. At work?
13    Q. Yes.
14    A. Yes.
15    Q. Who did you tell?
16    A. Everybody that was working. They knew I
17 called, because she called back and Kathy gave me the
18 phone.
19    Q. When you say "everybody that was working," can
20 you identify who those people were?
21    A. There was Latoya, there was Heather, there was
22 Kathy, Erin was there.
23    I can't recall the other aide that was there.
24    Q. How long after the phone call before you heard

152

1 from Jody at Wyngate?
2    A. Jody walked in while I was on the phone.
3    Q. Was Jody aware that you were calling
4 Ellen Hughes?
5    A. No.
6    Q. Jody was physically near you when you called
7 Ellen?
8    A. She walked in and went to her office when I was
9 on the phone with the nurse -- at the nurses' station.
10    Q. Why didn't you report your concerns directly to
11 Jody?
12    A. For one, I didn't know if she was going to be
13 there. For two, I was already on the phone speaking
14 to Ellen about the situation.
15    Q. Why didn't you report your concerns to Jody at
16 that point?
17    A. I'm not sure.
18    Q. You received a call from Jody, then, after you
19 went home from your shift?
20    A. Yes.
21    Q. You didn't talk to Jody again after you hung up
22 the phone with Ellen before she called you again that
23 evening?
24    A. Yes.

**153**

1  Q. What did Jody say to you?
2  A. Jody called and told me, "Do you know why I'm
3  calling?"
4  I was like "Yes."
5  She was like, "So you know that I've got to
6  terminate you?"
7  I said, "Yes."
8  She's like, "Do you know why?"
9  I was like, "Why?"
10  She was like, "The reason why I'm terminating
11  you is because you didn't follow the chain of
12  command."
13  It just started going from there pretty much
14  everything I just told you I talked to Jody over the
15  phone about. And Jody was telling me how much she
16  enjoys me working there, how much she likes that I'm
17  working there, that "Let me call and talk to Debbie
18  and see if we can figure something out and I'll call
19  you back."
20  She never called back.
21  Q. You didn't hear back from Jody again?
22  A. No.
23  Q. On Page 29 of your statement, you testified to
24  Mr. Wallace that you told Jody, "All the aides know,

**154**

1  all the AMAPs know, all the nurses know," all the
2  kitchen staff knows, housekeeping knows and people
3  have called corporate.
4  How do you know that the kitchen staff knew?
5  A. Because we spoke about it, too.
6  Q. How did you know that the housekeeping staff
7  knew?
8  A. We spoke about it, too.
9  Q. When you say "knew," what do you mean by that?
10  A. Knew of the situation that was going on.
11  Q. On October 29th, 2008?
12  A. Of all the situations.
13  They knew that something was going on and
14  nothing was done about it.
15  Q. In this section you talk about people who have
16  called corporate.
17  Is there anyone in particular that you were
18  referring to in this section?
19  A. Not particularly.
20  I gave you the names earlier of who called.
21  Q. Okay.
22  No additional people?
23  A. No.
24  Q. You testified next "And as far as I know" --

**155**

1  this is Line 23 on Page 29, "you know the situation,
2  too, Jody."
3  How did you know that Jody knew?
4  A. Because I spoke with her.
5  Q. Did you ever tell Mr. Wallace during this
6  statement that you spoke with Jody Bowden with respect
7  to these issues between Eula Stoll and
8  Robert Degenkolb?
9  A. I don't recall. I don't know. I don't know.
10  Q. Did you ever witness anyone reporting anything
11  to Jody?
12  A. No. Except for when me and Candace spoke to
13  her.
14  Q. On Pages 29 and 30 you testify that "my bosses
15  tell me to turn my head."
16  Which bosses told you to turn your head?
17  A. What was that? 29?
18  Q. Yes. Page 29, and it leads over to 30.
19  A. Because when I heard about when Debbie said to
20  shut the door and walk away, that pretty much is
21  saying turn your head and walk away and come back
22  later, and it proceeds, and my job is not to turn my
23  head.
24  Q. Did Debbie tell you to turn your head?

**156**

1  A. No.
2  Q. Were there any other bosses that told you to
3  turn your head?
4  A. No.
5  Q. No bosses told you this directly?
6  A. No.
7  Q. You testified during your statement to
8  Mr. Wallace that, "This is my job to take care of
9  these residents" -- I'm sorry.
10  Do you recall testifying to that?
11  A. To what?
12  Q. "This is my job to take care of these
13  residents."
14  A. Yes.
15  Q. Tell me what in your job duties or in any
16  instruction that you received made you believe that
17  you were the appropriate person to contact the family
18  instead of an outside agency or administration at
19  Wyngate.
20  MR. RECHT: Objection to the form of the
21  question.
22  BY MS. ABBOTT:
23  Q. Would you like me to rephrase it?
24  A. Please.