IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

- - -

**Certified Condensed Copy**
**Lewis Reporting Service**

WEIRTON HEALTH PARTNERS, LLC.,)
                               )
        Plaintiff,             )
                               )
    vs.                        )    Civil Action No.
                               )    5:09-CV-40
GABRIELLE YATES,               )
                               )
        Defendant.             )

- - -

Deposition of TAMMY M. PROVENZANO, RN

Friday, February 26, 2010

- - -

    The deposition of TAMMY M. PROVENZANO, RN,
called for examination by Plaintiff Nancy
Hartley, taken pursuant to Notice and the
Federal Rules of Civil Procedure pertaining to
the taking of depositions, before me, the
undersigned, Jackie J. Buckmaster, Court
Reporter/Commissioner in and for the State of
West Virginia, at the law offices of Schrader,
Byrd & Companion, The Maxwell Centre,
32 - 20th Street, Wheeling, West Virginia 26003,
commencing at 10:04 a.m. on the day and date
above set forth.

- - -

EXHIBIT
U

**Page 76**

1  on residents. Little things here and there,
2  you know, residents arguing in the dining
3  room, you know, like, you just handle it on a
4  daily basis, but there -- for the most part
5  this would be something that I would document
6  as a nurse.
7  Q.    Okay. Do I take it, then, that the
8  little things don't necessarily have to be
9  documented, but if it's something that's
10  considered to be important or unusual, those
11  are the kinds of things that should be
12  documented?
13  A.    Yes.
14  Q.    This would have been, at least in your
15  mind, considered important and unusual and,
16  therefore, should be documented?
17  A.    Right.
18  Q.    Okay. Now, after this incident of
19  July 22nd of 2008, did anybody call, whom
20  you know of, Eula's Stoll's daughter, to
21  advise the daughter -- and I think her name
22  was Ellen Hughes --
23  A.    Yes.
24  Q.    -- to advise the daughter that this

**Page 77**

1  particular incident had taken place, that
2  being that her mother was found in
3  Mr. Degenkolb's bed and he had his arms around
4  her and was kissing her in his bed?
5  A.    I called her that -- I believe it was
6  this next day that, you know -- the day that I
7  was told about the situation.
8  Q.    So you have a recollection, then, of
9  calling her on July 22nd, maybe July 23rd,
10  in that general time frame?
11  A.    I'm terrible with dates, but, yes, I did
12  call her, and I believe it was the same day
13  that it was reported to me.
14  Q.    Okay. Tell me in as much detail as you
15  can recall what you said and what she said
16  about this.
17  A.    I called her to report what was told to
18  me, that Eula was found in Bob's bed on top of
19  the covers, they were fully dressed and he had
20  his arms around her and he was kissing her.
21  She, in turn -- I didn't know what to
22  expect, you know. She, in turn, told me that
23  she had done a lot of research on Alzheimer's,
24  her mother had Alzheimer's and that she was

**Page 78**

1  totally okay with this. I mean, I'm
2  ad-libbing here. I don't know the specifics.
3  Q.    That's fine.
4  A.    She was okay with the situation, that
5  she was happy that her mother has found
6  someone that she could love while she lived at
7  the Wyngate and she was happy to know that her
8  mother was, you know -- she hoped that her
9  mother would be happy.
10  And it was not a negative thing in the
11  conversation. I mean, she did not appear
12  that -- in her mind that it was a negative
13  reporting from me. And I doc -- from what I
14  believe, I documented what she told me and
15  that, you know, she was okay with it.
16  Q.    Okay. Do you recall whether or not she
17  said anything to the effect that, It's okay if
18  my mom is friendly with Mr. Degenkolb, but I
19  don't want her in his bed in his room?
20  A.    We did not discuss intercourse, sexual
21  contact, things like that. I said to her --
22  it was brought up that -- Eula's room was a
23  couple doors down the hall from Bob's.
24  Q.    Right.

**Page 79**

1  A.    And it was toward the end of a long
2  hall. And she asked if -- or it came up that
3  Eula had an alarm system on her door to her
4  room, which I was not aware of. I don't
5  remember any alarms ever going off when she
6  exited or entered her room.
7  The daughter brought it to my attention.
8  I asked the staff member -- I don't know if it
9  was during the conversation on the phone. I
10  believe there was a nurse there. I might have
11  asked her if we had this alarm system set up
12  on the bedroom door of Eula's, and they said
13  it had been disalarmed [sic], it wasn't in
14  use.
15  Q.    Okay.
16  A.    The daughter didn't -- was not aware of
17  that at the time. And, anyway, we discussed
18  the alarm. We discussed that what we would do
19  in the future from that point on, when I was
20  talking with the daughter, was if Eula was
21  found in Bob's room -- we would monitor Eula
22  and try to avoid a situation where they would
23  have to be alone.
24  If she were found in Bob's room, we --

Nancy Hartley v. Weirton Health Partners, et al.          Deposition of Tammy M. Provenzano, RN - 2/26/2010

Page 80

1  the staff, whoever found her, would try not to
2  upset her in any way. Alzheimer's patients
3  can get upset or agitated easily, so they
4  would try not to upset her and just redirect
5  her back to her own room and try to stop any
6  further incidents from occurring.
7       That was pretty -- pretty much what I
8  got from the conversation with the daughter.
9  She agreed to that. She did not want her
10  mother being upset in any way.
11      She said, "That's fine."
12      And I explained to her that Eula's room
13  was so close to Bob's and that there were a
14  lot of times when she could wander down to his
15  room because the staff -- it wasn't a
16  one-on-one type of monitoring situation.
17      The daughter agreed. We were in
18  agreement that that could happen, but the
19  staff would just redirect her back to her own
20  room and try not to upset her in any way.
21  Q.    I'm trying to understand what you just
22  said.
23      If the staff found Eula in Bob's room,
24  they would gently try to redirect her to her

Page 81

1  room --
2  A.    Right.
3  Q.    -- or somewhere else in the facility;
4  is --
5  A.    Right.
6  Q.    -- that correct? That was okay with
7  Ellen?
8      In other words, she didn't have a
9  problem with Mr. Degenkolb spending time with
10  her mother --
11  A.    Correct.
12  Q.    -- but the understanding was that Eula
13  would be redirected out of his room --
14  A.    Right.
15  Q.    -- by the staff if that were to occur?
16  A.    Right. And it --
17  Q.    Is that a fair way of summarizing it?
18  A.    Yes. And it did not come up in the
19  conversation with her anything about if they
20  were found having sex or if, you know -- if
21  there were any kind of sexual contact or
22  nudity or anything like that. None of that
23  came up in the conversation.
24      It was just if we -- the staff found her

Page 82

1  with Bob alone in his room or anywhere, for
2  that matter, that we would just redirect her
3  back to her own room.
4  Q.    And do it in a gentle way as not to
5  upset --
6  A.    Right.
7  Q.    -- Eula?
8  A.    Right.
9  Q.    Okay. Did anybody talk to Bob? Did
10  anybody go to Bob and say, Bob, what's going
11  on here? You're spending a lot of time with
12  Eula Stoll, and you're a man who apparently
13  still has his mind, is still competent, who
14  knows what's going on --
15  A.    I talked to Bob.
16  Q.    -- and Eula - okay - is moderately to
17  severely debilitated because of her
18  Alzheimer's disease. What's going on?
19      Did anybody --
20           MS. ABBOTT: Objection to form.
21  BY MR. DUFF:
22  Q.    -- have that conversation with Bob?
23  A.    I spoke to Bob about it.
24  Q.    Okay. Would you tell me what he said

Page 83

1  and what you said in that conversation.
2  A.    From what I -- from what I can remember,
3  I spoke to him privately and, you know,
4  brought up the fact that, you know, the staff
5  has noticed that he's been spending time with
6  Eula. They often held hands in the dining
7  room. They sat together a lot, and he would,
8  you know, walk with her and hold her hand or
9  her arm.
10      And I just let him be aware that the
11  staff was aware that they were developing this
12  relationship, and I wanted to find out from
13  him what his intent was, you know.
14      I discussed it with him, and I said, you
15  know -- you know, I pretty much said -- told
16  him that I didn't want to see him taking
17  advantage of Eula.
18      And he said he would never do that. He
19  agreed, you know. "I will never do that."
20  Q.    Was that charted anywhere, do you
21  recall, that conversation?
22  A.    You know what? I don't believe I wrote
23  that down. I don't remember. I don't think I
24  did.